IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| KARIN HATCHEL | ) | |
| | ) | |
| v. | ) | No. 3:05-0139 |
| | ) | Judge Nixon/Brown |
| JO ANNE B. BARNHART, Commissioner | ) | |
| of Social Security | ) | |

To: The Honorable John T. Nixon, Senior Judge

**REPORT AND RECOMMENDATION**

This is a civil action filed pursuant to 42 U.S.C. §405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying plaintiff disability insurance benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"), as amended. The case is currently pending on plaintiff's motion for judgment on the pleadings (Docket Entry No. 7), to which defendant has responded (Docket Entry No. 11). For the reasons stated below, the Magistrate Judge recommends that plaintiff's motion be **DENIED**, and that the decision of the Commissioner be **AFFIRMED**.

I. INTRODUCTION

Plaintiff applied for DIB with a protective filing date of November 28, 2000 (Tr. 58). Her application was denied initially and on reconsideration (Tr. 39, 46). Plaintiff

1

thereafter requested a hearing before an Administrative Law Judge ("ALJ"), which hearing was held on June 6, 2003 (Tr. 355-375). Plaintiff was represented by an attorney at the hearing. On August 14, 2003, the ALJ issued a written decision denying plaintiff's claim (Tr. 18-24). The ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Act on August 25, 1998, the date she stated she became unable to work, and continued to meet them through December 31, 2002, but not thereafter.

2. The claimant has not engaged in substantial activity since August 25, 1998.

3. The medical evidence establishes that the claimant had "severe" impairments, including fibromyalgia, chronic fatigue syndrome, arthritis, and depression, but did not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The subjective complaints are not credible for the reasons given above.

5. The claimant had the residual functional capacity to perform light work, as described more fully above.

6. The claimant was able to perform her past relevant work during the relevant period.

7. The claimant was not under a "disability," as defined in the Social Security Act, at any time through December 31, 2002, the date she was last insured for such benefits.

(Tr. 24).

On December 29, 2004, the Appeals Council denied plaintiff's request for review of the decision of the ALJ (Tr. 6-

8), thereby rendering that decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. Id.

## II. REVIEW OF THE RECORD

Plaintiff was born on November 3, 1943 and was 59 years old at the time of the ALJ decision (Tr. 18). She has a high school education (Tr. 78). Her last regular full-time work was as an office manager for an employment agency, which she left for medical reasons in August 1998 (Tr. 359-360). She worked part-time as a telephone sales representative from November 1999 to February 2000 (Tr. 73) and as a companion/home helper to an elderly couple in September 2000 (Tr. 81). She alleges that she cannot work due to fibromyalgia,[1] pain, fatigue, depression, difficulty concentrating, etc. (Tr. 361, 72). Her alleged disability onset date (AOD) is August 25, 1998 and her date last insured (DLI) for benefits is December 31, 2002 (Tr. 18).

Plaintiff experiences a number of medical problems dating

---

[1] According to the Johns Hopkins Arthritis Center, "Fibromyalgia is a common, chronic, generalized pain syndrome of unknown origin. Although pain and tenderness are its defining features, fatigue, sleep disturbance, non-cardiac chest pain, depression and poor concentration are also common." http://www.hopkins-arthritis.org/other/fibromyalgia.html.

3

back to at least 1991. She complained of depression and migraine headaches in November and December 1991 (Tr. 210). She complained of those problems as well as a sore throat, muscle aches, and a fear that she might have AIDS in May 1992 (Tr. 206). In 1994, she had a new job and was doing "quite well" (Tr. 198). In 1995, her husband died of cancer and she worried that she might have cancer and she was under an extreme amount of stress (Tr. 195). A lot of the stress was at work and she found it hard to go to work in August 1995 (Tr. 191).

In December 1996, she complained of exhaustion all the time, joint pain, being under a lot of stress from difficulties with family members, and was worried that silicone breast implants might be causing medical problems (Tr. 238-239). One of her doctors, Dr. Jacobi, did not think the implants were causing problems. Her physical exam was essentially normal with some minor abnormalities (Tr. 238). The doctor thought her main problem was "situational stressors": "We spent by far and away most of the interview talking about these stressors, and I think they'll play a huge role in her general sense of well being. I think no matter what her final diagnosis is here, those stressors and how she handles them are of primary significance" (Tr. 239).

In 1997, plaintiff was not taking Prozac and was

4

encouraged to take it (Tr. 189).[2]  In 1998, she was not doing exercises that were recommended.  She also was extremely "stressed out" at her job (Tr. 187).  In October 1999, x-rays showed degenerative changes in both hips (Tr. 173-174).  In the same month, Dr. Andrews said that plaintiff had to resign her job due to pain, that extreme fatigue is plaintiff's overriding concern, that she has a number of symptoms, some of them "not particularly worrisome" (Tr. 231-232).  Dr. Andrews thought plaintiff's fatigue was "more dramatic than most folks with fibromyalgia" and that chronic fatigue might be a better name for her condition (Tr. 233).  On another occasion, Dr. Andrews said that she thought that plaintiff had fibromyalgia but that she had a lot of anxiety about her symptoms and there was no unifying diagnosis to explain all the symptoms (Tr. 230).

In November and December 2000, Dr. Patil said that plaintiff was convinced that she had chronic fatigue syndrome and that she stopped working due to very stressful situations (Tr. 254).[3]  Dr. Patil also said that plaintiff needs to make changes, to lose weight, do exercises, and establish an appropriate sleep

---

[2] Prozac is indicated for the treatment of major depressive disorder. See Physician's Desk Reference (PDR) (59th ed. 2005) at 1874.

[3] According to MedlinePlus, "Chronic fatigue syndrome is a condition of prolonged and severe tiredness or weariness (fatigue) that is not relieved by rest and is not directly caused by other conditions.  To be diagnosed with chronic fatigue syndrome, the tiredness must be severe enough to decrease ability to participate in ordinary activities by 50%." http://www.nlm.nih.gov/medlineplus/ency/article/001244.htm.

5

cycle (Tr. 251). Dr. Patil thought that plaintiff's problems were aggravated by increased inactivity, especially discontinuing work. Id.

In February 2001, plaintiff's mother completed a questionnaire and stated that plaintiff has no difficulties caring for herself, no trouble completing tasks, can prepare meals, go shopping, do chores, drive, walk, engage in regular activities, and has had no change in lifestyle (Tr. 95-97). Her mother also said that plaintiff does not work "[b]ecause she does not want to work." She concluded, ". . . I feel the claim for disability is not warranted" (Tr. 98). A friend of plaintiff, Ms. Brewer, completed a questionnaire and stated that plaintiff can prepare meals, do regular household chores, do shopping, go to church and movies, sew, concentrate and finish projects (Tr. 115-116). Ms. Brewer said plaintiff quit her job due to stress and that she has not had contact with plaintiff for several months (Tr. 118). In another questionnaire, plaintiff's mother said that plaintiff exaggerates and misrepresents issues and "does not have any condition which prevents her from performing work, recreational, or other normal routines and activities." (Tr. 119-122). Plaintiff's mother generally sees plaintiff once or twice a week (Tr. 119).

In March 2001, plaintiff's former employer stated that the Plaintiff had reported to work most of the time and her

6

attendance was "satisfactory".  She was able to maintain an
ordinary work routine, understand and carry out detailed work
instructions, maintain attention and concentration, perform
assigned tasks at a consistent pace, work with others, and
respond appropriately to changes and stresses in the workplace
(Tr. 127-129).  Also in March, another friend of plaintiff's said
that she has difficulty finding the energy to get started, gets
very tired, cannot regularly attend meetings and other
activities, and could no longer work (Tr. 130-132).  In addition,
he said she no longer goes on walks or bike riding and pain wears
her out.  He stated that she cannot do things she used to do (Tr.
123-126).

     In the same month, a psychological evaluation was done
by Dr. Phay (Ph.D.), who found plaintiff "mildly anxious",
"mildly depressed", and "concentrated" throughout the interview
(Tr. 284). Plaintiff complained of waking up exhausted and not
feeling well enough to go anywhere. In addition, she "reports a
problem with concentration and terrible difficulties with memory"
(Tr. 286).  Dr. Phay found her "impaired" in her concentration,
persistence, and ability to adapt to a normal work environment
(Tr. 287).  Also in March, state agency psychological consultant
Dr. Walker (Ph.D.) completed an evaluation form finding that
plaintiff had mild difficulties in social functioning; moderate
difficulties in activities of daily living, and in maintaining

7

concentration persistence, and pace (Tr. 299). Her other limitations were only mild or moderate and he concluded that she could "sustain schedule, concentration, persistence, and pace with occasional lapses" (Tr. 305).

Dr. Keown examined plaintiff in March 2001 and noted numerous subjective complaints. Nonetheless, the physical exam was essentially normal except for general tenderness. Plaintiff had good range of motion in all joints, except the left hip but there was only "minimal" loss of range of motion. Dr. Keown concluded that plaintiff could sit, walk, and stand 6 hours in an 8-hour day; lift 10-15 pounds routinely, and 25-30 pounds episodically (Tr. 309). In April 2001, a state agency physician said that plaintiff could lift 10 pounds frequently and 20 pounds occasionally (Tr. 311). She also could sit, as well as stand and/or walk for 6 hours in an 8-hour day.

In October 2001, a treating physician, Dr. Blankenship, completed a form indicating that plaintiff could sit only 1-2 hours in an 8-hour day; stand or walk less than 1 hour; and infrequently lift 1-10 pounds (Tr. 323). He said that she could not be expected to complete a normal workday or workweek and she would be chronically absent from work (Tr. 324-325). His office notes stated that plaintiff was noncompliant by missing appointments (Tr. 328). She also declined recommended counseling (Tr. 333).

8

At her administrative hearing, plaintiff testified that her impairments caused both pain and fatigue, and that the fatigue was with her all the time (Tr. 361-62). She does not sleep well at night, but usually takes one long nap per day (Tr. 362). She testified that her pain moves around a lot, but is particularly bad in her hips, groin, thighs, and left foot (Tr. 363). The pain is constant in some areas, and variable in others (id.). She takes over-the-counter pain medication, as well as an over-the-counter sleep aid (Tr. 363-64). These medications do not help significantly (Tr. 364). Plaintiff also testified that at the time of the hearing she was experimenting with a TENS (transcutaneous electrical nerve stimulator) unit, and that she used to take baths to help relax her muscles and relieve her pain, but was unable to continue because she became unable to lift herself out of the bathtub (Tr. 364-65).

Plaintiff testified that she could lift a gallon of milk out of the refrigerator, but had to be careful in doing so because she could "pull [her] hip out" (Tr. 365). She spends about four hours a day laying in a recliner (id.). She can stand for 15-20 minutes before needing to sit or lie down (Tr. 366). She could sit in a normal chair for only 10-15 minutes before needing to move around (Tr. 366-67). She further testified that she was depressed, and was only able to do about half of the household chores and prepare simple meals, with her husband

9

taking care of the rest (Tr. 368-69).

### III. CONCLUSIONS OF LAW

#### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. Jones v. Secretary, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Secretary, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." Her v. Commissioner, 203 F.3d 388, 389 (6th Cir. 1999)(citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." Bell v. Commissioner, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. Her, 203 F.3d at 389 (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. Hurst v.

10

Secretary, 753 F.2d 517, 519 (6th Cir. 1985).

      B. *Proceedings at the Administrative Level*

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
(2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[4] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.
(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a prima facie case of disability.
(5) Once the claimant establishes a prima facie case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national

---

[4] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

11

economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. Id. In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. See Varley v. Secretary, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. § 423(d)(2)(B).

12

C.  Plaintiff's Statement of Errors

Plaintiff alleges three errors in the ALJ's decision: (1) he failed to state plaintiff's RFC with specificity; (2) he stated that the assessment of the consulting psychologist allowed for the performance of plaintiff's past relevant work, when the VE testified that he could not conclude as much from that assessment; (3) he erroneously failed to credit the assessment of plaintiff's treating physician, Dr. Blankenship.  For the reasons that follow, the undersigned concludes that the ALJ did not err in any of the foregoing respects.

Plaintiff argues that it is unclear what the ALJ found her RFC to be, especially with regard to her mental abilities. Specifically, she contends that the ALJ appears to have accepted the mental limitations described by the consulting psychologist, Dr. Phay, but then failed to incorporate those limitations as he interpreted them into his RFC finding.  Plaintiff argues that "the mandate of the regulations" which assign to the ALJ the duty of determining RFC also requires that said determination be expressed plainly, and not in the alternative as was done here. However, the undersigned does not find reversible error here. The ALJ found that plaintiff was exertionally limited to light work (Tr. 23-24).  Whether or not plaintiff retained the ability to perform the full range of light work (as found by Dr. Keown) or a range of light work limited by the nonexertional restriction

13

to only occasional postural activities (as found by the state agency physician), the VE testified that plaintiff's past relevant work would remain available (Tr. 370-71). The VE further testified that these jobs would remain available despite the presence of nonexertional limitations due to mild or moderate psychological symptoms (Tr. 371). In light of this testimony, the undersigned concludes that it was not error for the ALJ to fail to entirely accept or reject the evidence of postural and psychological limitations in finding that plaintiff retained the capacity to perform her past relevant work.

Plaintiff next contends that if the ALJ credited Dr. Phay's assessment, it is not clear that the VE's testimony would provide substantial evidence of mental ability to return to past relevant work, since Dr. Phay concluded that plaintiff "is impaired in her ability to sustain concentration and persistence, and her ability to adapt to a normal work environment" (Tr. 287), without specifying the degree of that impairment, and the VE admitted on cross-examination that this assessment, standing alone, is too vague to allow a determination of the existence of jobs (Tr. 373-74). However, it is clear that the ALJ credited the assessment of Dr. Phay to the extent that it supports a finding of no more than moderate limitation of functioning due to psychological impairments. This is consistent with the interpretation of the state agency consultant (Tr. 289-306).

14

Also, as alluded to by the ALJ (Tr. 23), to the extent that Dr. Phay's assessment supports greater than moderate functional limitation, it is inconsistent with plaintiff's failure to seek mental health treatment, her refusal to undergo recommended counseling, and her poor credibility.  The VE was clear in testifying that moderate psychological limitations, however proved, would not preclude plaintiff's past relevant work.  Accordingly, the undersigned finds no error on this point.

  Finally, plaintiff contends that the ALJ erred in rejecting the opinion of Dr. Blankenship, plaintiff's regular treating physician.  Plaintiff quotes familiar language from the regulations and Sixth Circuit authority regarding the deference owed to treating sources in view of their greater familiarity with their patients' symptoms and diagnoses.  However, Dr. Blankenship's extremely restrictive assessment of plaintiff's functional abilities is inconsistent with his own treatment notes, which reflect frequent notations of plaintiff generally appearing well in addition to notations of noncompliance with medications and other recommendations (Tr. 327-346).  It also appears to be inconsistent with all other medical evidence of record, including the notes and reports of other treating internists (Drs. Andrews and Patel), a rheumatologist (Dr. Jacobi), and the government-retained consulting physician (Dr. Keown).  Perhaps more importantly, given the fact that

15

fibromyalgia and chronic fatigue syndrome produce few objective indicia of the symptoms they produce, the credibility of plaintiff's subjective report of those symptoms is a crucial factor in assessing her functional limitations.  <u>Swain v. Comm'r of Soc. Sec.</u>, 297 F.Supp.2d 986, 990 (N.D. Ohio 2003); <u>see generally</u> <u>Warner v. Comm'r of Soc. Sec.</u>, 375 F.3d 387, 392 (6th Cir. 2004).  In view of the ALJ's abundantly supported finding of plaintiff's general lack of credibility, based in large part on the reports of plaintiff's true abilities by her mother, friend, and previous employer, as well as the lack of any objective corroboration of Dr. Blankenship's RFC assessment, that assessment is simply not due any measurable deference despite his status as a treating physician.  Neither the regulations nor the caselaw cited in plaintiff's brief (Docket Entry No. 8, pp. 7-8) require a different result.

In short, the decision of the Commissioner is well supported, and should be affirmed.

### IV.  RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment be **DENIED**, and that the decision of the Commissioner be **AFFIRMED**.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it

with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

        **ENTERED** this 2nd day of September, 2005.

        /s/ Joe B. Brown
        JOE B. BROWN
        United States Magistrate Judge